LERCH and others, appellants, and OBERLY and others, respondents.*

When, by an order of the Orphans Court, under the statute, more land is ordered to be sold than is necessary to pay the debts of an intestate, the proceeds of such sale, to the extent of such excess, are not, in legal contemplation, converted into personalty, but will go to the heir-at-law, and if he die under age, will descend to his heirs the same as the land if unsold would have done.

Owen Oberly, of Warren county, died on the first day of September, 1852, intestate, seized of a valuable farm in that county, leaving a widow, the defendant, Anna Maria Lerch, who afterwards was married to the defendant, Benjamin F.

* CITED in Wurts' Ex'rs v. Page, 4 C. E. Gr. 375; Cook's Ex'r v. Cook's Adm'r, 5 C. E. Gr. 377; Fidler v. Higgins, 6 C. E. Gr. 145; Schenck v. Vail, 9 C. E. Gr. 551.

Lerch, and one child, Emma Oberly, an infant three weeks old. His personal estate was not sufficient to pay his debts. Administration of his estate had been granted to his widow, and upon application by her and the defendant, Benjamin F. Lerch, who, after the intermarriage, had been joined with her in the administration, the Orphans Court of Warren county, in April, 1853, made an order for the sale of the farm to pay debts of the intestate, to the amount of $3818.87. On the fourth of September, in that year, the farm was sold for $12,876.49, including the widow's right of dower. Of this sum one-third was invested on mortgage for the life of the defendant, Anna Maria; and of the residue there remained, on the settlement of the final account on the sixth of April, 1859, $5794.41, above debts and expenses. This balance was paid unto Charles Oberly, one of the complainants, who had been duly appointed guardian of the infant, Emma Oberly.

In 1861, Charles Oberly, as such guardian, received $389.59, the infant's share of that part of the proceeds of the lands of her paternal grandfather, John Oberly, situate in the county of Warren, sold in 1834, by a partition sale, which had been invested for the dower of her grandmother, Catharine Oberly, who died in 1860; and also $1694.47, her share of proceeds of lands of the same grandfather, situate in Pennsylvania, sold about the same time on like proceedings, and which had been invested for the same purpose.

The infant, Emma Oberly, died on the second of April, 1865, aged twelve years, leaving the complainants, Charles Oberly, John F. Oberly, and Robert Oberly, her paternal uncles, and the complainant, Emma Baker, the daughter of her deceased paternal aunt, her only heirs-at-law, besides her mother, who inherited for her life; and leaving her mother and three infant children of her mother by the second marriage, her next of kin.

In 1865, after the death of Emma, the complainant, Charles Oberly, as her guardian, settled his account in the Orphans

Court of Warren county, upon which the balance was $9464.74.

In September, 1865, administration of the estate of Emma Oberly, was committed by the surrogate of Warren county to the defendants, Benjamin F. Lerch, Anna Maria Lerch, and Jehiel T. Kern, who thereupon sued the complainant, Charles Oberly, the late guardian, in the Supreme Court of this state, for the whole balance in his hands.

The bill in this cause was filed to enjoin that suit. The cause was argued in the Court of Chancery, upon a motion to dissolve the injunction. The motion was denied. The opinion of the Chancellor is reported *ante p.* 346.

*Mr. Shipman* and *Mr. Vanatta,* for appellants.

*Mr. E. T. Green* and *Mr. J. Wilson,* for respondents.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

The question of law which has been argued in this case before this court, relates to the legal destination of the surplus proceeds of lands sold for the payment of the debts of a decedent, under the order of the Orphans Court of the county of Warren. The fund in question is a surplus remaining after the settlement of the administration, and the dispute is, whether such surplus is to be considered, with regard to the parties now before the court, as real or personal estate. The intestate left surviving him one child, who died subsequently to the sale and during her minority, and the contestants for the fund are the heirs-at-law and the personal representatives of such infant.

On the part of the heirs-at-law, who are the respondents in this court, it is insisted that the rules of equitable conversion apply to the facts of the case, and that the object of the sale of the real estate of the intestate being simply to pay the debts of the estate, the land cannot be considered converted into money in judicial consideration, except to the

extent necessary to effectuate such purpose. As a conse-
quence of this theory, it is further contended that as this
money came to the heir of the intestate impressed with the
character of realty, such heir, being an infant, could not re-
move such character, and that, therefore, its devolution must
now be regulated by the law of inheritance, and not by the
rules of distribution.

There can be no doubt, either as to the existence or fixed
character of the doctrine of equity to which reference is
thus made. The principle is established by a multitude of
cases, that where real estate is directed, either by the owner
or by the order of the law, to be converted into money for a
particular object, and a surplus remains after the accom-
plishment of such object, such surplus, as between the heir
and personal representative of such owner, will be regarded
by a court of equity as land, and will descend as such. The
authorities on this subject will be found fully collected in
connection with the conspicuous cases of *Fletcher* v. *Ash-
burner*, and *Ackroyd* v. *Smithson*, in 1 *Lead. Cas. in Eq.*
775 *and* 809. And this *transubstantiated real quality*, as
Lord Hardwicke terms it,(3 *Atk.* 446,)with which, in the es-
timation of equity, such surpluses have been impressed, re-
mains until their absolute owner, being *sui juris*, has
manifested an intention to divest them of such character,
and to treat them as personalty. And, accordingly, by force
of these principles, which are not to be disputed, it is now
urged that as the purpose of the order of the Orphans Court,
in the present case, was to effect a payment of the debts of
the estate, the sale of the lands in excess of such purpose,
will not, in point of equity, accomplish a conversion, and that
the surplus money now in controversy retains its notional
impress of realty, and must descend as such to the heir-at-
law. The reply of the counsel of the appellants to this in-
sistment was, that the order of the Orphans Court was not
simply an order for a sale of the land to pay the debts of the
estate, but that it embraced another purpose, which was the
benefit of the heir of the decedent; and that, consequently,

a conversion out and out has occurred, the result being, that the money came to the heir as personalty, and must be distributed as such. But is this assumption founded in the facts of the case? The statute by force of which the sale in question was made, after empowering the Orphans Court, in case of a failure of the personalty, to order a sufficiency of the real estate to be sold, contains this provision; "That, where any houses and lots, or lands, are so circumstanced that a part thereof cannot be sold without manifest prejudice to the heirs or devisees, the said court may, at their discretion, order the whole, or a greater part than is necessary to pay such debt, to be sold; and the surplus money arising from such sale shall be distributed among the heirs or devisees, according to the law of descents in the former, and the will of the testator in the latter case." In the instance now before us, the Orphans Court directed the entire property to be sold, on the ground that the sale of a part would be a manifest prejudice to the heirs. Now, I think it is clear that the entire purpose of this sale was to obtain a fund with which to pay the debts of the decedent. Such sale was a necessity, and would have been ordered, no matter how disastrous it might have been thought to the interest of the infant. The provision of the act authorizing a sale, under the circumstances specified, of more land than might be necessary to produce the requisite amount, is merely a legislative direction to do as little injury as possible to the heir-at-law or devisee. I see nothing in this course of proceeding which seems to indicate any intention to alter the nature of the property with regard to its heritable capacities. It does not appear to me to differ from a general direction to sell lands for a special purpose, in which case it is clear that by the rules of law already adverted to, such direction and sale will operate to convert the fund so far only as it disposes of it. The statutory procedure falls short of effecting a conversion out and out; the conversion, as it seems to me, being for a limited purpose only, the surplus fund in question came to the heir-at-law of the decedent as realty for all the purposes of succession.

The cases upon this subject are somewhat conflicting, but I think the above conclusion is sustained by a preponderance of authority. *Cooke* v. *Dealey,* 22 *Beav.* 196 ; *Banks* v. *Scott,* 5 *Madd.* 493 ; *Wright* v. *Rose,* 2 *S. & S.* 323 ; *Bourne* v. *Bourne,* 2 *Hare* 35 ; *Jermy* v. *Preston,* 13 *Sim.* 356 ; *Sweezy* v. *Thayer,* 1 *Duer* 286 ; *Merick* v. *Bavier,* 6 *Ired. Eq. R.* 524 ; *Lloyd* v. *Hart,* 2 *Barr* 473.

But had I arrived at a different result, I should not have felt at liberty to decide this case on the general doctrine, for to my mind it is clear that our decision must rest upon the same foundation as the case of *Snowhill* v. *Snowhill,* 2 *Green's C. R.* 20. In that case, the lands of an infant had been sold by virtue of a special act of the legislature, which had been enacted on representations that such sale would be for the benefit of the infant. The sale having taken place, the infant heir being still in his minority died intestate, and the question arose whether the fund, the produce of the sale of the land, passed to the heirs or to the next of kin of the infant. The Chancellor regarded the fund as personalty, but his decision was reversed in the Court of Errors.* This case in my opinion, is not to be distinguished in the least degree, from the present case ; and it has been the unquestioned law of this state for over thirty years. It is a decision of the highest court in the state, and I do not think we are free to say that it has not, in practice, been followed. The law is uncertain, indeed, if the final conclusions of this court, after so long a lapse of time, are not to be considered as unalterable, so far as judicial action is concerned. Nor am I able to perceive any reason which should incline this court to a reversal of this decision. Such a result would, clearly, be not consistent with the policy on this subject, as exhibited in the legislation of the state. If we refer to our laws authorizing the sale of the lands of infants, or those of lunatics, we find the rights of the heir-at-law carefully guarded ; the statutory provisions being, that the proceeds of such sales " shall be considered relative to the statutes of descents and distribution and for every other purpose, as real estate of the same nature as the

---

* The decision of this court is not reported. *See* 1 *Green's C. R.* 30.

property sold." With this system, it is plain the decision referred to is in perfect harmony. Indeed, it would be an obvious incongruity if the proceeds of the sale of lands of an infant, sold by an order in the course of administration of an estate, should, on the death of the infant, go to the next of kin, while the proceeds of a sale made on a direct application for the benefit of the infant, should pass to the heir-at-law. By adhering to the decision of the Court of Errors, in the case under consideration, we avoid any such inconsistency. Nor should we forget, that by the operations of established rules, our courts of equity produce a similar result, for in these tribunals it is a fixed principle never to permit the property of an infant to be changed from personal to real, or from real to personal, so as to affect the succession to it. 2 *Atk.* 413; 1 *P. Wm.* 389. Such course is also eligible in respect to the circumstance that it removes all temptation from the relatives of infants to endeavor, after a conversion of lands into money, to divert them from the line of descent.

In my opinion, this point, which is the only substantial one in the case, should be considered as *res adjudicata.*

The decree of the Chancellor was also objected to because costs were awarded against the defendants in the court below. But I find no error in this. It is true that such defendants were before the court in a representative character, but it is obvious that, in this controversy, they stand in the place of the next of kin, who are the contestants for the fund in question, against the heirs-at-law. Under such circumstances they should not be permitted to carry on this litigation except at the risk of costs. Administrators are not compellable, unless indemnified, to prosecute doubtful claims for the benefit of the next of kin.

These were the only points raised on the argument.

I think the decree should be affirmed, with costs.

It is proper to say that no question was made with regard to the standing, in this court, of the appellant in this case. The appeal was from a refusal of the Chancellor to dismiss a

temporary injunction, restraining a suit at law for the purpose of the proceeding in chancery. Such refusal was with costs against the party making the motion. Whether such an order is a proper subject of appeal has not been mooted, and is not decided.

The decree of the Chancellor was affirmed by the following vote:

*For affirmance*—BEASLEY, C. J., ELMER, FORT, KENNEDY, OGDEN, VAIL, WALES.    7.

*For reversal*—BEDLE, DALRIMPLE, VREDENBURGH, WOOD-HULL.    4.